IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JOHN FASBINDER,<br><br>        Plaintiff,<br><br>vs.<br><br>CITY OF OVERLAND PARK,<br>KANSAS, DIANE JOHNSON, and<br>TRACY GIBSON,<br><br>        Defendants. | Case No. 09-2043-JAR |

## MEMORANDUM AND ORDER

Plaintiff John Fasbinder brought this civil rights action against defendants Diane Johnson, Tracy Gibson, and the City of Overland Park, Kansas ("City"), stemming from an incident on July 25, 2007, in which plaintiff was arrested and jailed. Plaintiff asserts a claim under 42 U.S.C. § 1983 against Johnson and Gibson in their individual capacities for unreasonable seizure in violation of the Fourth Amendment. Plaintiff's second claim is for false arrest and false imprisonment under Kansas law against all remaining defendants. Before the Court are cross motions for summary judgment: plaintiff's Motion for Partial Summary Judgment (Doc. 43) and defendants' Motion for Summary Judgment (Doc. 45). The Court has reviewed the parties' briefs and is prepared to rule. As described more fully below, defendants' motion is granted on the federal claims and plaintiff's motion is denied. The Court declines to exercise supplemental jurisdiction over the state law claim and, therefore, remands that claim to the state district court.

**I.    Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1] A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[2] An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[3] The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[5] "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[6] The burden may be met by showing that there is no evidence to support the nonmoving party's case.[7] If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[8] When the moving party also bears the burden of proof at trial,

> a more stringent summary judgment standard applies. Thus, if the

---

[1]Fed. R. Civ. P. 56(c).

[2]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3]*Id.*

[4]*Id.* at 251–52.

[5]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[6]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[7]*Id.*

[8]*Id.*

> moving party bears the burden of proof, to obtain summary
> judgment, it cannot force the nonmoving party to come forward
> with "specific facts showing there [is] a genuine issue for trial"
> merely by pointing to parts of the record that it believes illustrate
> the absence of a genuine issue of material fact. Instead, the moving
> party must establish, as a matter of law, all essential elements of
> the issue before the nonmoving party can be obligated to bring
> forward any specific facts alleged to rebut the movant's case.[9]

When examining the underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[10]

## II.     Uncontroverted Facts

The following facts are uncontroverted, stipulated to, or taken in the light most favorable to the nonmoving party.[11]

### *Overland Park Police Department Policy*

The City is now, and at all times relevant to these proceedings, a municipal corporation organized and existing under the laws of the State of Kansas. At all times relevant hereto, Gibson and Johnson were employed by the City as law enforcement officers.

The Overland Park Police Department ("OPPD") General Order 1000 regarding arrest and detention, in effect on July 25, 2007, provides:

> OPPD Officers may exercise their powers as law enforcement officer:
>     1. Anywhere within the city limits;

---

[9]*Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citations omitted).

[10]*See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[11]Plaintiff fails to respond to defendants' statement of facts nos. 40–62. To the extent these statements of fact are supported by the record, they are deemed uncontroverted. *See* D. Kan. R. 56.1(a) ("All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party.").

3

> 2. While outside the city limits if:
> …
> b. In any other place law enforcement officers have requested an OPPD officer's assistance;
> c. In fresh pursuit or pursuit without delay of a person who has or is reasonably suspected of having committed a crime; . . .

General Order 1000 relating to arrest and detention is provided to the officers of the OPPD to aid them in making arrests and in detaining people.

OPPD General Order 1080 relates to domestic violence. This General Order was adopted pursuant to K.S.A. § 22-2307 and for the purpose of ensuring that the provisions that K.S.A. § 22-2307 are implemented. General Order 1080 expressly provides that the procedures outlined in the General Order, "are intended to ensure domestic violence is treated as a crime and the provisions of K.S.A. § 22-2307 and amendments thereto are implemented." Domestic violence is defined within this General Order as, "any harmful physical contact or threat thereof, destruction of property or harassment between associated individuals or formerly associated individuals, used as a method of coercion, control, revenge or punishment." Included within the definition of associated individuals are spouses. General Order 1080 further provides for mandatory arrest as follows:

> A. Mandatory Arrest Considerations:
> 1. Are the parties associated or formerly associated individuals as defined herein?
> 2. Is there harmful physical contact or a threat thereof, destruction of property or harassment? Note: Harmful contact does not necessarily mean physical injury.
> 3. Were the aforementioned actions reviewed in Consideration 1 above used as a method of coercion, control, revenge or punishment? During this assessment consider:
> a. The likelihood that violence will occur between the parties that day or night; and,
> b. The totality of the circumstances, such as history of violence

>and repeated calls.
>4. Is there Probable Cause to believe a crime was committed? During this assessment consider the necessary elements for the crime.
>B. Arrest is Mandatory if Considerations 1 through 4 in the above Arrest Analysis is answered in the affirmative, and the party shall be arrested and processed as outlined by this policy.

This General Order further provides that, "[i]f during the on-scene investigation, or at any other time during domestic violence investigations, an Officer determines there is probable cause to believe a crime is being or has been committed, the Officer will make an arrest in accordance with this policy." This General Order further provides that if it is determined that a crime of domestic violence has been committed and the suspect has left the scene and the suspect has been located, if probable cause exists, the officer is required to arrest and process the suspect in compliance with Department policy.

*Wildman's Police Report*

In July 2007, Dr. Giselle Wildman and plaintiff were married and resided together at a residence in Overland Park. On July 25, 2007, at 6:19 a.m., Wildman called the Overland Park Police Department to report that plaintiff had committed the crime of domestic violence and criminal damage to property. The dispatch report reflects that the nature of the call was a disturbance as well as a physical fight. The dispatch report further states that, "Dr. Fasbinder is husband who was throwing things." Further comments in the dispatch report indicate "Left in Silver Lexus, possibly en route to his office. Took some files from the house. Possibly took some files from her office in Suite 115. Pushed her and shoved her, broke glass." In her "911" call, Wildman expressed concern for and fear of plaintiff, telling the operator that she was shaking and that plaintiff was shattering things, that he shoved her, and that he threatened her by

5

telling her he would put a nail in her coffin. She said he had taken "all" of their files; he had taken "everything." Wildman stated that he had made horrible accusations and told the operator that plaintiff had left and that she believed he was going to his office.

That day, Gibson and Johnson were working as police officers on patrol assignments for the OPPD. Gibson was dispatched to Wildman's and plaintiff's residence at 6:29 a.m.; Johnson was dispatched there at 6:37 a.m. Gibson's dispatch indicated that an incidence of domestic violence had just occurred at this residence. Johnson's dispatch indicated that the call related to domestic battery and that the suspect had left the scene. When Gibson arrived at the residence, she made contact with Wildman and noticed that she was shaking and upset. Wildman escorted Gibson to the office area of the residence where Gibson observed a broken picture frame and glass on the floor. As the primary officer on the scene, Gibson was responsible for interviewing the victim and taking notes to make a detailed report about what happened and to provide a chronology. Johnson was the secondary, or backup, officer on the scene.

Gibson requested that Wildman explain why she called OPPD. Wildman provided an account that is reflected in Officer Gibson's narrative in the police report:

> I asked Mrs. Wildman to explain how the picture was broken. She said she returned from being out of town for 5 days when she entered into the garage and saw her husband carrying an armful of files.
> Mrs. Wildman said she said hello to her husband, John Fasbinder, and she said he responded by saying I am not talking to you. She said she entered the house and went into the office that they share and he went in after she was in there. She said he told her she needed to get an attorney. She told me they were having marital problems. She said he told her she was being deceitful and manipulative. She said at this point he took the picture off of the wall and broke it. She said he then grabbed the paper that was inside the frame and torn it [sic] up and stated "This is a lie." Mrs. Wildman said she was shocked and scared because he has never

6

> acted that way before. She said she had given the framed poster and note to him as a gift and it was a quote about love.
>
> Mrs. Wildman said Mr. Fasbinder walked out of the office and towards the kitchen. She said she followed behind him to see where he was going and what he was doing. She said as he was in the kitchen he immediately turned around and was facing her. She said she was standing right in front of him at this point and he pushed her to the side knocking her into the center island. She said this scared her and didn't know what he was going to do next. She said she did not follow him after that and then he left in his vehicle. Mrs. Wildman said she immediately called her friend to ask what she should do. She said her friend instructed her to call the police so she did.
>
> Mrs. Wildman said she and Mr. Fasbinder were having marital problems but it was never physical. She said while she was out of town, he text messaged her at least 25 times in the form of harassment. She said she had accidentally deleted these off of her phone. She said she does recall one message that said "This is the nail in your coffin." Mrs. Wildman was shaking during my contact and repeatedly said she was upset and scared.

Johnson also recorded a narrative account of Wildman's statement that is substantially similar to Gibson's narrative account. Wildman acknowledges that the statements attributed to her in the police report accurately reflect her statements on July 25, 2007, with some minor clarifications.

Wildman told the OPPD officers that she was scared for her own safety and that she was terrified. She told the officers that she feared plaintiff might return to the residence and do more physical harm: "In fact, that was a really, really big deal for me. I was terrified based on what he said and how he acted."

Wildman further informed the OPPD officers that earlier in the morning on July 25, 2007, plaintiff sent her a text message that stated "this is the nail in your coffin" and that plaintiff reiterated this statement several times that morning. Gibson asked Wildman to demonstrate the manner in which plaintiff pushed her out of the way. Wildman demonstrated how plaintiff used two hands in a motion of pushing someone to the side. She stated that her side was sore as a

7

result of being pushed into the kitchen counter. Johnson observed Wildman's back to determine if she had any injuries because Wildman mentioned that she believed her back was injured. Johnson did not have the impression that Wildman was making the story up or fabricating her account of the incident.[12]

*Plaintiff's Arrest*

Gibson believed she had probable cause to arrest plaintiff based on the information provided to her by Wildman and on her observations at the residence. Officer Johnson also believed she had probable cause to arrest plaintiff for domestic battery based on the information received from dispatch, the evidence she observed at the residence, and the reports and demeanor of Wildman, including her complaint of injury. The OPPD officers decided that a mandatory arrest was warranted based on OPPD General Order 1080.

At 7:40 a.m., Johnson left Wildman's residence and went to plaintiff's dental office in Prairie Village, Kansas, based on Wildman's statement that he was there. Johnson contacted the Prairie Village Police Department ("PVPD") to assist them in contacting plaintiff. The PVPD dispatcher told Johnson that they were "blacked out," meaning that all units were on duty at the time and could not respond. Gibson recalls that Johnson told her that the PVPD had no available units to respond and Johnson told them that they would respond, which PVPD acknowledged. Johnson and Gibson understood that the PVPD made a "request for assistance." Johnson and Gibson also believed that they were in "fresh pursuit" of plaintiff because they had pursued him without unnecessary delay upon receipt of information that established reasonable suspicion that

---

[12]Plaintiff does not dispute any of the statements made by Wildman to the OPPD on the morning of July 25, 2007. He further concedes that he broke a framed picture over his knee during an argument and that he took the personal note off of the frame and tore it up in anger.

8

plaintiff had committed a crime.

When Gibson and Johnson arrived at plaintiff's dental office, they informed plaintiff they wanted to speak to him about his wife. Officer Gibson asked him to provide his side of the story as to what happened at his residence that morning. Officer Gibson eventually placed plaintiff under arrest. Plaintiff was patted down and transported to the Sanders Station and then, eventually, to the Johnson County Detention Center, where he remained until posting bond.

*Charges*

The criminal charges filed against plaintiff were instituted as a direct result of the statements of Wildman. Plaintiff acknowledges that defendants Johnson and Gibson arrested him in direct reliance on the representations made to them by Wildman. While plaintiff believes that Wildman made allegations of domestic battery and criminal damage to property in order to have plaintiff arrested and eventually gain control of their residence and other financial assets, and to have an advantage in the couple's upcoming divorce, he has no information that the officers had knowledge that Wildman made her statements in malice or that her statements were exaggerated or intentionally false.

Plaintiff was charged by the Johnson County District Attorney ("DA") with domestic battery in violation of K.S.A. § 21-3412a and K.S.A. § 21-4502(1)(b). Plaintiff filed a motion to suppress and to dismiss and the court conducted a hearing and heard evidence on the motion. The court found that the arrest of plaintiff at his dental office was unlawful and that all statements made at the time of his arrest are suppressed. The court found that the arrest was unlawful because the OPPD officers did not have authority to arrest plaintiff at his dental office in Prairie Village and transport him to the Johnson County Jail. The criminal charges brought

against plaintiff by the Johnson County District Attorney's Office were dismissed by the DA's Office prior to trial and prior to empaneling a jury.

## III. Discussion

### A. *Section 1983*

Plaintiff asserts a claim under 42 U.S.C. § 1983 against defendants Johnson and Gibson in their individual capacities for violations of the Fourth Amendment. "The doctrine of qualified immunity protects government officials "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[13] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[14] The doctrine "is designed not only to shield public officials from liability, but also to ensure that erroneous suits do not even go to trial."[15]

On summary judgment, a plaintiff must demonstrate: "(1) that the defendant violated his constitutional or statutory rights, and (2) that the constitutional right was clearly established at the time of the alleged unlawful activity."[16] The Supreme Court has recently held that district courts are permitted "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the

---

[13] *Pearson v. Callahan*, —U.S.—, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[14] *Id.*

[15] *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 780 (10th Cir. 1993).

[16] *Swanson v. Town of Mountain View, Colo.*, 577 F.3d 1196, 1199 (10th Cir. 2009).

particular case at hand."[17]

Plaintiff has previously identified two aspects of his Fourth Amendment claim: (1) a challenge to defendants' authority to engage in police action outside of Overland Park, Kansas, and (2) a challenge to defendants' authority to execute an arrest of plaintiff without a warrant. It is unclear in the Pretrial Order whether plaintiff continues to pursue his claim that the arrest was an unreasonable seizure because it was warrantless, and he does not address this aspect of his claim in either his motion for partial summary judgment or in his response to defendants' motion for summary judgment. The Court will address this claim out of an abundance of caution.

### 1. Jurisdiction for Arrest

Plaintiff alleges that Gibson and Johnson violated his clearly established Fourth Amendment rights by acting outside of OPPD jurisdiction when they arrested him in Prairie Village, Kansas. The Court addresses whether the law was clearly established at the time of plaintiff's arrest that an arrest outside of OPPD jurisdiction was unconstitutional. The Tenth Circuit has explained the relevant inquiry as follows:

> A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right. Indeed, a plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it. Although Plaintiff does not need to find a case with an identical factual situation, he still must show legal authority which makes it apparent that in the light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue. Therefore, for a right to be clearly established we look for Supreme Court or Tenth Circuit precedent on point, or clearly established weight of authority from other courts that found the

---

[17]*Pearson*, 129 S. Ct. at 818.

11

law to be as the plaintiff maintains.
   One purpose of qualified immunity is that we do not force public officials to guess how the law will have developed by the time their actions are scrutinized in federal court. Instead, we look to the relevant precedents at the time of the challenged actions and the obviousness of the violation in light of them.[18]

Plaintiff's Fourth Amendment claim is premised on his contention that the OPPD officers violated Kansas law by making a warrantless arrest outside of OPPD jurisdiction. Specifically, plaintiff argues that the arrest was unlawful based on the officers' violation of K.S.A. § 22-2401a(2) and the OPPD General Order 1000. At the time of plaintiff's arrest, the statute provided:

> (2) Law enforcement officers employed by any city may exercise their powers as law enforcement officers:
>   (a) Anywhere within the city limits of the city employing them and outside of such city when on property owned or under the control of such city; and
>   (b) in any other place when a request for assistance has been made by law enforcement officers from that place or when in fresh pursuit of a person.[19]

Plaintiff contends that Gibson and Johnson violated K.S.A. § 22-2401a, and that under the Tenth Circuit's decision in *Ross v. Neff*, his arrest is presumptively unreasonable.[20] In *Ross*, state law enforcement officers attempted to enforce a state law by arresting a Native American without a warrant on tribal trust land. The court held that "an arrest made outside of an arresting officer's jurisdiction violates the Fourth Amendment to the Constitution and is therefore

---

[18]*Swanson*, 577 F.3d at 1200 (citations an quotations omitted).

[19]The statute was amended in 2010; however, the amendments did not impact subsection (2). *See* 2010 Kan. Sess. Laws Ch. 42 (H.B. No. 2638).

[20]905 F.2d 1349 (10th Cir. 1990).

12

actionable pursuant to 42 U.S.C. § 1983 under the appropriate circumstances."[21] It noted that an arrest made in hot pursuit, however, would most likely be constitutional.[22]

Several cases decided since *Ross* have limited its holding.[23] In *United States v. Green*,[24] the court explained, "the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended."[25] The *Green* court distinguished *Ross* on the ground that *Ross* involved a warrantless arrest outside of the arresting officer's jurisdiction, whereas *Green* involved a warranted search; the court declined to extend *Ross* to the context of warranted searches.[26]

In *United States v. Mikulski*,[27] the court decided whether an apparent violation of Utah law that allowed an arrest outside of the arresting officer's normal jurisdiction under certain circumstances constituted a federal constitutional violation.[28] The court discussed a Seventh Circuit decision distinguishing *Ross* on the basis that it did not concern the jurisdiction of

---

[21]*Id.* at 1353–54.

[22]*Id.* at 1354 n.6.

[23]Plaintiff makes an attempt to discuss this line of cases in his response brief to defendants' motion for summary judgment (Doc. 57 at 6–10). The Court takes this opportunity to point out that plaintiff's entire discussion of *Ross* and its progeny has been "copied and pasted" almost verbatim from the Tenth Circuit's discussion of these cases in *Swanson*, 577 F.3d at 1201–04. In fact, the only deviation the Court can detect is that plaintiff changed the references to the Tenth Circuit from "we" in the *Swanson* opinion to "the court" in his brief. This discussion is neither provided as a block quotation, nor attributed to the court in plaintiff's brief. Plaintiff's counsel is admonished for his failure to properly attribute this authority to the Tenth Circuit, instead, representing this discussion of the *Ross* line of cases as his own.

[24]178 F.3d 1099, 1106 (10th Cir. 1999).

[25]*Id.* at 1106; *accord United States v. Sawyer*, 441 F.3d 890, 899 (10th Cir. 2006) ("State law is not determinative of the federal question.").

[26]*Green*, 178 F.3d at 1106.

[27]317 F.3d 1228, 1232–33 (10th Cir. 2003).

[28]*Id.* at 1231.

13

officers "acting between political subdivisions of the same state."[29] Under the facts of the case, the *Mikulski* court found that this apparent violation of Utah law did not reach the level of a federal constitutional violation.[30] The court referred to the fact that the officer had probable cause to believe that a public offense had been committed, which was one of the bases for making an arrest outside of the jurisdiction under Utah law.[31] The court further found that because the arresting officer learned that the plaintiff was armed, the officer was authorized to arrest the plaintiff without contacting the local law enforcement authority under the statute.[32] The Tenth Circuit has twice described *Mikulski* as holding that "a warrantless arrest outside an officer's jurisdiction (but within the same state) did not rise to a constitutional violation even though the arrest violated state law in part because the officers were acting within political subdivisions of the same state."[33]

Tenth Circuit authority on July 25, 2007 had limited the *Ross* holding, as *Miksula* and *Sawyer* were both decided prior to this date. Based on this authority, even assuming that Officers Gibson and Johnson violated state law when they arrested plaintiff at his dental office in Prairie Village, plaintiff is unable to show that the arrest violated clearly established law that

---

[29]*Id.* at 1232 (discussing *Pasiewicz v. Lake County Forest Preserv Dist.*, 270 F.3d 520, 527 n.3 (7th Cir. 2001)).

[30]*Id.* at 1233.

[31]*Id.*

[32]The court further limited *Ross* in *United States v. Gonzales*, where it concluded that a traffic stop outside of an officers' jurisdiction does not constitute an unlawful seizure under the Fourth Amendment, even if it is not authorized by state law *Id.* at 1183; *see also Swanson v. Town of Mountain View, Colo.*, 577 F.3d 1196, 1203 n.5 (10th Cir. 2009).

[33]*Swanson*, 577 F.3d at 1203 n.5; *United States v. Sawyer*, 441 F.3d 890, 898–99 (10th Cir. 2006). While cases published prior to July 25, 2007 govern the Court's analysis, the Court "also examine[s] cases published after the conduct in question to the extent they shed light on the fact that the law was not clearly established at the relevant time." *Swanson*, 577 F.3d at 1200.

14

their actions offended the Fourth Amendment.  A reasonable police officer would not have known at the time of plaintiff's arrest that arresting him outside of OPPD jurisdiction, but within the state of Kansas, constituted a clearly established Fourth Amendment violation.  Accordingly, Gibson and Johnson are entitled to qualified immunity from suit and defendants' motion for summary judgment is granted on this basis.  Plaintiff's motion for summary judgment must, therefore, be denied.

### 2. Warrantless Arrest

Plaintiff alleged in the Second Amended Petition and in his response to defendants' motion for judgment on the pleadings that his Fourth Amendment claim encompassed his contention that the arrest was unreasonable because it was warrantless.  According to plaintiff's allegations in the pleadings, defendants exceeded their authority when they arrested plaintiff because Judge Phelan ruled on January 8, 2008 that plaintiff's arrest was "unlawful" and "quashed" his arrest.

"A warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."[34]  Defendants have submitted Judge Phelan's order granting plaintiff's motion to suppress in the criminal case.  However, that finding was made on the basis that the OPPD officers acted outside of their jurisdiction when they arrested plaintiff, not on the basis that they lacked probable cause.

"Probable cause to arrest exists when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in

---

[34] *United States v. Turner*, 553 F.3d 1337, 1344 (10th Cir. 2009) (quotation and citations omitted).

themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"[35] Gibson believed she had probable cause to arrest plaintiff based on the information provided to her by Wildman and on her observations at the residence. Johnson also believed she had probable cause to arrest plaintiff for domestic battery based on the information received from dispatch, the evidence she observed at the residence, and the reports and demeanor of Wildman, including her complaint of injury. The OPPD officers decided that a mandatory arrest of was warranted based on OPPD General Order 1080. In fact, there is no genuine issue of material fact that the OPPD officers had probable cause to arrest plaintiff. Plaintiff concedes and the officer testified in her deposition that they had no reason to believe that Wildman had fabricated her allegations of domestic violence. Based on Wildman's description of the incident and her injuries to them, as recorded in the narrative report, the fact that Wildman was shaking and upset, as well as their own observations of the broken glass on the floor of the residence, the officers had probable cause to arrest plaintiff. Moreover, it was reasonable for the officers to believe under these circumstances that the mandatory arrest provisions arrest provisions in OPPD 1080 applied. For all of these reasons, the warrantless arrest of plaintiff did not violate his constitutional rights and defendants are entitled to qualified immunity on this aspect of his Fourth Amendment claim.

B.    *State Law Claim*

Because the Court grants summary judgment to defendants on the federal claims, it is authorized to decline supplemental jurisdiction over the remaining state law claim of false arrest

---

[35] *United States v. Zamudio-Carillo*, 499 F.3d 1206, 1209 (10th Cir. 2007) (quoting *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004)).

and false imprisonment.[36] Whether to exercise supplemental jurisdiction is committed to the court's sound discretion.[37] 28 U.S.C. section 1367 "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness and comity.'"[38]

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."[39] "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."[40] Plaintiff declines to point this Court to any compelling reasons that would justify not remanding these state law claims. The Court finds that this is the usual case in which principles of judicial economy, convenience, fairness, and comity all point in favor of remand of the remaining Kansas law claim for false arrest and false imprisonment to state court.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff's Motion for Partial Summary Judgment (Doc. 43) is **denied** and defendants' Motion for Summary Judgment (Doc. 45) is **granted** on the federal claims. Plaintiff's remaining state law claim is hereby remanded to

---

[36]28 U.S.C. § 1367(c)(3).

[37]*City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997); *see also Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995).

[38]*City of Chicago*, 522 U.S. at 173 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *see also Gold v. Local 7 United Food & Commercial Workers Union*, 159 F.3d 1307, 1310 (10th Cir. 1998), *overruled on other grounds by Styskal v. Weld County Commr's*, 365 F.3d 855 (10th Cir. 2004).

[39]*Carnegie-Mellon Univ.*, 484 U.S. at 357.

[40]*Thatcher Enters. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).

the District Court of Johnson County, Kansas.

Dated: May 10, 2010

                                                S/ Julie A. Robinson
                                                JULIE A. ROBINSON
                                                UNITED STATES DISTRICT JUDGE